**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Crim. No. 09-47 (JMR/JJK) |
| Plaintiff, | |
| v. | |
| 1. Daniel Martin Barrera-Omana, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Christian S. Wilton, Esq., Assistant United States Attorney, counsel for Plaintiff.

Daniel B. Mohs, Esq., Daniel Mohs & Associates, Ltd., counsel for Defendant.

This matter is before this Court on Defendant's Pretrial Motion for Suppression of Physical Evidence (Doc. No. 25), and Defendant's Pretrial Motion for Suppression of Confessions or Statements in the Nature of Confessions (Doc. No. 26). Specifically, Defendant seeks to suppress from evidence at trial the 1000 grams of cocaine seized from his sister and co-defendant, Jacqueline Barrera-Omana, and the statements made by Defendant following his arrest, on the grounds that law enforcement officers lacked sufficient reasonable, articulable suspicion of criminal activity to stop the vehicle in which he was a passenger. Defendant argues that the drugs seized and statements made by Defendant are the fruits of the illegal stop and detention. This Court held a

hearing on the motions on July 16 and 22, 2009,[1] and received testimony from the following two witnesses: Officer Charles Redmond and Officer Joe Ryan of the St. Paul Police Department.  The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court recommends that Defendant's motions be denied.

## BACKGROUND

On December 8, 2008, at 8:41 p.m., an unknown male who identified himself as "Jerry," called 9-1-1 and reported that a burglary was in progress at a house located at 68 W. Jessamine Avenue West in St. Paul, Minnesota.  The caller stated that he saw three "Mexican" males, appearing to be about 30 years old, kick in the back door of the house and go inside.  He stated that he saw the individuals get out of a white pick-up truck but did not see any weapons on them.  The caller indicated that he did not know the telephone number that he was calling from because the phone belonged to a friend, and that he did not want to be seen by police when they arrived on the scene.  The caller then hung up the phone.

---

[1] The Court issued an Order on motions dated July 23, 2009, taking Defendant's Pretrial Motion for Suppression of Physical Evidence (Doc. No. 25), and Defendant's Pretrial Motion for Suppression of Confessions or Statements in the Nature of Confessions (Doc. No. 26), under advisement for submission to the District Court on Report and Recommendation.  (Doc. No. 48.)

2

At that time, Officers Redmond and Ryan were on routine patrol in the area in separate, marked squad cars, when they received a Priority 2[2] call from dispatch of a possible burglary in progress at the house located at 68 Jessamine Avenue West. Officer Redmond testified at the suppression hearing that he was familiar with the Jessamine area and that he considered it to be a high-crime area. Officers Redmond and Ryan responded immediately to the dispatch and arrived at the scene approximately three minutes later. En route, through radio communication and computer aided dispatch ("CAD") comments,[3] dispatch indicated that one Hispanic male was trying to kick in the back door and that three Hispanic males entered the house. Dispatch also indicated that the individuals were reported to have gotten out of a white pick-up truck.

Officers Redmond and Ryan, driving in their separate squad cars, were the first officers to arrive at the scene. At that time, it was dark outside and extremely snowy. Officer Ryan turned east on Jessamine in front of the house-at-issue. Officer Redmond turned east in the alley behind the house. At that point, Officer Redmond saw a white pick-up truck approximately a half block away traveling southbound on Sylvan Street. Believing the truck to be the suspect vehicle, Officer Redmond proceeded to the end of the alley and turned right onto Sylvan Street, following the white pick-up truck heading south. Upon

---

[2] A Priority 2 call is the second highest call ranking used by dispatch and is used when the act reported is in progress.

[3] CAD is a system through which police officers can view the call information on laptop computers located in their squad cars.

3

learning that Officer Redmond was following a white pick-up truck, Officer Ryan then proceeded to follow Officer Redmond. They followed the truck one block south to Magnolia Avenue, where Officer Redmond turned on his squad car's emergency lights to initiate a stop of the truck. Officer Ryan testified that the truck was the only white pick-up truck that he saw in that area and in fact the only vehicle that he saw traveling in that area. After Officer Redmond activated the squad's lights, the white pick-up truck continued southbound on Sylvan Street for one block, turned west onto Cook Avenue, and then pulled over. Officer Redmond walked up to the truck and approached the driver's side window. At approximately that same time, Officers Joe Labathe and Michelle Ward arrived together in a third marked squad car to assist Officers Redmond and Ryan.[4] Officer Ryan stated that it took a total of approximately six minutes from the time he received the dispatch call to the time of the stop.

    Officer Labathe joined Officer Redmond by the truck on the driver's side and Officers Ryan and Ward approached on the passenger side. All of the officers were in uniform, but none of the officers had their weapons out as they approached. Officer Ryan testified that the truck had tinted windows and that he could not initially see how many people were inside, their gender, or their nationality. Once they approached the vehicle and both the driver and front

---

[4] At that same time, a separate investigation conducted by other officers was going on at 68 Jessamine Avenue West, and the CAD comments reflect that officers there had reported that two doors were open at the house.

passenger had rolled down their windows, the officers discovered four occupants in the truck: a Hispanic male in the driver's seat, a Hispanic female in the front passenger seat, a Hispanic male sitting in the back seat behind the driver, and an African American female sitting in the back seat behind the front passenger. Defendant was the Hispanic male sitting in the back seat behind the driver.

Officer Redmond asked the driver for his driver's license and the driver provided it to him. Officer Redmond then asked the driver and the Defendant where they were coming from. They both stated Minneapolis.[5] Officer Ryan heard Officer Ward ask the female sitting in the front if she knew where she was, and she stated she thought she was in Minneapolis but she did not know where she was. When asked, the female sitting in the back seat on the passenger side stated that she did not know where they were because she had been asleep.[6] Officer Ryan testified that the person sitting in the back seat on the passenger side had a lot of energy and was not in disarray, which was not consistent with her having been sleeping. He also testified that the female sitting in the front seat had her hair short or had it tied up, and was wearing a baseball jacket or over-coat, and that she could have been mistaken for a male. He stated that he also noticed that she kept her hands down as if she were cradling something,

---

[5] The driver spoke limited English.

[6] Officer Redmond stated in his report that "all had conflicting stories about why there were in the area." (Doc. No. 55, Def.'s Br. in Supp. of His Mots. to Suppress Evidence ("Def.'s Br.") 3.) Officer Ryan stated in his report that the occupants were giving "conflicting stories about where they were coming from." (Def.'s Br. 4.) Defendant contests that the passengers gave conflicting stories.

5

which based on his training and experience, alerted him to the possibility of weapons in the vehicle. Officer Ryan then decided, based on his perception of suspicious conduct (i.e., hands being tucked away and restlessness), and his distrust about what the passengers were saying, that he would "pull" the occupants out of the truck to identify them, to question them separately, and for the officers' safety.

Officer Redmond asked the driver to exit the vehicle. The driver complied and Officer Redmond patted him down and placed him in his squad car. Officer Ward asked the front female passenger to exit the vehicle, which she did, keeping her hands cradled around her mid-section. Officer Ward asked whether she had any weapons or anything illegal on her person. She responded that she did. Officer Ward then began a pat search on her. Almost immediately, a large wrapped package containing what turned out to be 1,000 grams of cocaine fell to the ground from underneath her sweatshirt. The passengers, including Defendant who was the backseat passenger on the driver side, and the driver were then taken into custody.

Defendant was subsequently indicted for Possession with Intent to Distribute Cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2.

## DISCUSSION

I.  **Motion to Suppress Evidence**

Defendant asserts that the police illegally stopped the white pick-up truck that he was a passenger in on December 8, 2008, and conducted an illegal search and seizure. Specifically, Defendant alleges that the officers made the stop without a reasonable, articulable suspicion of criminal activity. Defendant moves to suppress the evidence obtained as a result of the search and seizure.

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. *United States v. Roby*, 122 F.3d 1120, 1123 (8th Cir. 1997). A roadside traffic stop "is well established" as a "'seizure' within the meaning of the Fourth Amendment." *United States v. Jones,* 269 F.3d 919, 924 (8th Cir. 2001) (quoting *Delaware v. Prouse,* 440 U.S. 648, 653 (1979)); *see also United States v. Martinez-Fuerte,* 428 U.S. 543, 556-58 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975). In addition, a passenger in a motor vehicle has the same standing as the driver to challenge the legality of the stop. *Brendlin v. California*, 551 U.S. 249, 255-56 (2007).

A police officer may conduct an investigative stop only if the officer has a reasonable suspicion that the vehicle or its occupants are involved in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 30 (1968); *United States v. Bell,* 480 F.3d 860, 863 (8th Cir. 2007). The police officer must have "a particularized and objective basis" for suspecting criminal activity. *Bell*, 480 F.3d at 863 (quoting *United States v. Jacobsen,* 391 F.3d 904, 906 (8th Cir. 2004)). "Whether the

7

particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *Id.* (quoting *United States v. Maltais,* 403 F.3d 550, 554 (8th Cir. 2005)).

Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003). Therefore, a stop may be justified even where no traffic violation has occurred. *United States v. Mora-Higuera*, 269 F.3d 905, 909 (8th Cir. 2001). In addition, reasonable suspicion may be based on an anonymous tip so long as the tip is both reliable and corroborated. *Alabama v. White,* 496 U.S. 325, 330-32 (1990). "Whether an anonymous tip suffices to give rise to reasonable suspicion depends on both the quantity of information it conveys as well as the quality, or degree of reliability, of that information, viewed under the totality of the circumstances." *United States v. Wheat,* 278 F.3d 722, 726 (8th Cir. 2001) (citing *White,* 496 U.S. at 330).

If an investigatory stop is not justified by reasonable suspicion, any evidence derived from the stop is inadmissible at trial. *See Wheat,* 278 F.3d at 726 (citing *Wong Sun v. United States,* 371 U.S. 471, 484 (1963)).

Defendant concedes that his motions to suppress "turn on the sole issue of the stop of the truck." (Def.'s Br. 5.) The key question before the Court therefore is whether the anonymous tip that described three Hispanic males in their 30's

8

kicking in the back door of a residence, and who had been seen getting out of a white pick-up truck, provides sufficient indicia of reliability to justify the investigative stop by Officer Redmond when viewed under the totality of the circumstances presented here. Defendant asserts that the anonymous tip had a low degree of reliability and therefore required substantially more corroboration than the officers undertook before they could justify stopping the white pick-up truck.

     Here, it is true that Officer Redmond based his reasonable suspicion on an anonymous tip that provided a generic description of the suspects—three Hispanic males in their 30's—and a generic description of their vehicle—a white pick-up truck. The anonymous tip provided no further description of the truck's occupants, no license plate information or other distinguishing features of the vehicle, and no information on which direction the truck was traveling. Further, the officers agree that the truck did not make any evasive actions either before or after Officer Redmond initiated his emergency lights. Nonetheless, the police found a vehicle matching the description provided in the immediate area of the crime scene immediately after receiving the anonymous tip. This Court therefore concludes that Officer Redmond had a reasonable, articulable suspicion justifying the stop based on the information dispatched and based on the truck's temporal and geographic proximity to the crime scene.

     The white pick-up truck was spotted a half of a block away from the reported scene of the break-in and within approximately three minutes of the

dispatch. The truck's temporal and geographic proximity to the crime scene cannot be much closer. At the time that he made the stop, Officer Redmond reasonably suspected that the people inside the white pick-up truck were involved in the reported break-in based on the fact that it was the only white pick-up truck in the area—indeed it was the only vehicle traveling in this high crime area—and the truck was spotted only a half a bock away from the scene of the break-in within minutes of the anonymous tip.[7] If the white pick-up truck had not been stopped, the police would have lost the chance to conduct the investigation. This Court is required to give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997) (citations omitted). Considering the totality of the circumstances that were known to Officer Redmond just prior to the traffic stop, and particularly the extremely short distance between the location of the truck and the scene of the reported break-in, the extremely short period of time between the stop and the officers' reception of the initial dispatch, and the allegations that the break-in was clearly criminal, this Court finds that there was reasonable suspicion to support the investigative stop. *See United States v. Juvenile TK*, 134 F.3d 899, 904 (8th Cir. 1998) (finding reasonable suspicion of criminal activity that justified the investigative stop of a

---

[7] Although there is no evidence that the police had any experience with the informant in this case, this fact alone is not dispositive where there are independent indicia of reasonable suspicion. *See United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995) (holding that the location of the suspect parties is a factor that may reasonably lead an experienced officer to investigate).

vehicle based on the vehicle's temporal and geographic proximity to the crime scenes; the vehicle—identified generically as "a gray car"—was spotted no more than two blocks away from the scene of the robbery and within five minutes of the second dispatch). Accordingly, this Court finds no Fourth Amendment violation in the traffic stop of the white pick-up truck that Defendant was a passenger in, and recommends that Defendant's motion to suppress be denied.[8]

## II. Motion to Suppress Statements

At the hearing, Defendant's counsel represented that his motion to suppress statements asserts only that Defendant's statements should be suppressed because they are fruit of the poisonous tree (i.e., flowed from the unlawful stop, search, and seizure). Under the "fruit of the poisonous tree" doctrine, "the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality." *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987). Because this Court finds no Fourth Amendment violation in the traffic stop, it concludes there is no basis to invoke the "fruit of the poisonous tree" doctrine under these

---

[8] Although not raised by Defendant, this Court notes that the subsequent detention and arrest of Defendant were also justified. Once stopped, an officer may then conduct a "reasonable investigation," which includes "asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose," and he "may engage in similar routine questioning of the vehicle['s] passengers to verify information provided by the driver." *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995) (citations omitted). Defendant advances no argument that he was detained longer than necessary or that the officers' questions were beyond the proper scope of inquiry.

circumstances. Therefore, this Court recommends that Defendant's motion to suppress statements be denied.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion for Suppression of Physical Evidence (Doc. No. 25), be **DENIED**; and

2. Defendant's Pretrial Motion for Suppression of Confessions or Statements in the Nature of Confessions (Doc. No. 26), be **DENIED**.

Date: August 14, 2009

                                             *s/Jeffrey J. Keyes*
                                             JEFFREY J. KEYES
                                             United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 28, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.